# INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## International Arbitration Tribunal

SHERA MARIE HODGSON WILLIAMS,
    Claimant,

v.                                    ICDR Case No. 01-16-0002-6900

NORWEGIAN CRUISE LINES (Bahamas) LTD.,
    Respondent

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated April 8, 2013, and having been duly sworn, and having duly heard the proofs and allegations wherein the Claimant Shera Marie Hodgson Williams was represented by John Billera, Esq. and the Respondent Norwegian Cruise Lines (Bahamas) LTD was represented by Scott Mebane, Esq. and Christine M. Dimitriou, Esq. at a final hearing on December 13-15, 2017 in Miami, FL, do hereby enter the AWARD herein.

## PROCEDURAL HISTORY

The Claimant Shera Marie Hodgson Williams commenced this arbitration proceeding against her former employer, Respondent Norwegian Cruise Lines (Bahamas) LTD ("NCL"). The Claimant has essentially alleged that on or about June 3, 2013, she injured her back when she slipped and nearly fell on salad oil left on the galley floor area of NCL's ship while carrying a heavy food tray. As a result, the Claimant seeks damages against NCL in excess of $2,000,000 for claims of: Jones Act negligence; unseaworthiness; maintenance and cure benefits (i.e. unpaid surgical procedure); and disability benefits under NCL's Collective Bargaining Agreement

1

("CBA"). The Claimant additionally seeks reasonable attorney's fees for having to bring this action to recover her unpaid maintenance and cure claim.

In response, NCL asserts that the Claimant never injured her back as a result of an alleged slip on salad oil on June 3, 2013. In fact, NCL maintains that any back problems experienced by the Claimant were never trauma or accident related. NCL asserts that the Claimant's allegations of a slip and near fall on June 3, 2013 surfaced only after she retained legal counsel in March 2016. As a result, NCL asserts that the Claimant is entitled to no damages for Jones Act negligence; unseaworthiness; or a disability payment under the CBA. NCL further contends that it has met all of its maintenance and cure obligations to the Claimant and thus, has no further obligations to the Claimant. NCL further argues that the back surgery undergone by the Claimant was not medically necessary and at best, palliative in nature. Accordingly, NCL denies any responsibility for the payment of Claimant's surgery or reasonable attorney's fees for bringing this action.

## FACTUAL FINDINGS

The following findings are in support of the Award entered herein. They are based upon the testimony and documentary exhibits presented at the Final Hearing as well as the post-hearing written submissions of the parties. To the extent these findings differ from any party's position, that is the result of the determinations made by the undersigned Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and weighing of the evidence, both written and oral.

Claimant Shera Marie Hodgson Williams is a 34-year old Nicaraguan citizen and single mother of two teenaged daughters. She who was formerly employed by Respondent NCL as an

Assistant Waiter onboard its cruise ships from October 29, 2012-March 2016. Prior to her employment with NCL, the Claimant had worked as a Crew Mess Attendant on cruise ships for Royal Caribbean for approximately 2 years.

The Claimant was originally hired by NCL as a Restaurant Steward on October 29, 2012. At that time, she was a relatively healthy person, with no prior reported accidents or injuries. As part of the employment process, NCL required her to undergo an in-depth physical examination which included x-rays and a head-to-toe evaluation by a physician selected by cruise line. No illnesses or infirmities, including back injury pain, were noted on her pre-employment examination. She then commenced her employment with NCL.

As a Restaurant Steward, the Claimant was initially assigned a position as a Crew Mess Attendant where she refilled the food line and provided clean utensils for use by the crew members to clean tables and floors. Approximately two months later, however, she was promoted to the position of Assistant Waitress. As an Assistant Waitress, she was required to provide food for the guests in the main dining rooms. She did this by assisting the waiter in serving the guests, and returning to the galley with a tray of dirty dishes. As an Assistant Waitress, the Claimant was also on her feet an average of 9-11 hours a day (with interval breaks) carrying trays weighing an average of twenty-five pounds. With tips, she estimates that she earned an average of $2,000 per month, an amount far greater than what she could earn in her native Nicaragua.

From October 29, 2012 until July 3, 2016, the Claimant only once reported a backache. She testified that on February 10, 2013, she experienced some back pain in the shower while bending

3

down to wash her foot. Specifically, she stated that she felt a "pull" in her back. She said that the pain lasted only a few minutes and she went to the ship's infirmary to receive painkillers.

In this arbitration proceeding, the Claimant has alleged that on or about July 2, 2013 and while working onboard the Norwegian Sky, she severely injured her back when she slipped and nearly fell while carrying a heavy food tray in a crew-only area. She claims to have slipped on spilled salad dressing[1] left on the floor for a period of time. According to the Claimant, the salad dressing spill was approximately a foot and one-half in diameter and was located inside the galley area that was restricted to crewmembers. Thus, she surmises that the salad dressing could have only been dropped in the area by another crewmember. She testified that there were no warning signs posted near the spill. She also testified that there were footprints through the salad dressing evidencing that other persons had walked through it without cleaning or marking it.

As a result of her claimed slip, the Claimant testified that she experienced a pull in her back and pain radiating down her leg. She claims to have immediately reported this incident to her supervisor, but does not recall his or her name. In fact, no other witnesses to this alleged spilled salad dressing were identified herein. No investigation of the Claimant's alleged slip was performed by NCL nor was she interviewed by NCL's security personnel about this alleged event as is customarily done.

As an experienced seafarer who worked for two cruise lines, the Claimant was well aware of her obligations to timely report any accidents sustained for the purposes of an investigation and preparation of an investigative report. In fact, the evidence reflects that after her alleged slip, she had an accident inside her cabin where a refrigerator fell on her left hand as she attempted to

---

[1] At other times, the Claimant described this substance as water or an "oily substance."

open it. In addition to receiving medical treatment, she immediately reported this refrigerator accident to NCL and an investigation was launched. She was required to give a statement to NCL's security personnel members. These security personnel took pictures of the scene and prepared an investigative report of this refrigerator accident.

In the instant case, however, no investigation, statements, pictures, or investigative report was ever prepared for the Claimant's alleged slipping accident on salad dressing. It is specifically found that no investigation was conducted by NCL because: (1) the Claimant never reported any July 2, 2013 accident to NCL prior to retaining legal counsel; and (2) no such accident or incident ever occurred. The Claimant's self-serving and unsubstantiated claim of a July 2, 2013 slipping accident was undermined by other credible circumstantial evidence adduced at the final hearing. Accordingly, her claim that she slipped on salad dressing or any other foreign substance on NCL's galley floor on July 2, 2013 is rejected. The more credible evidence indicates that any back, neck and/or leg pain sustained by her was the result of a degenerative disc condition, likely triggered and/or exacerbated by her carrying heavy trays during the performance of her duties for NCL.

The Claimant reported to the ship's infirmary on July 3, 2013, the day after her claimed slipping incident. At that time, she credibly reported to the ship's physician (i.e. Dr. Jenny Garcia), that she had "upper back pain for a few days, getting worse after carrying a tray." The Claimant specifically denied to Dr. Garcia that her pain was "trauma-related."

On or about July 8, 2013, NCL sent the Claimant to South Miami Hospital to undergo a lumbar spine MRI. This MRI showed a small central disc protrusion noted at L5 through S1.

5

The Claimant followed up at the ship's infirmary complaining of back pain. She was ordered to continue on pain medications.

On July 12, 2013, NCL sent the Claimant shore-side in Miami to see Dr. James Voglino, an orthopedic surgeon, for further treatment. The Claimant told Dr. Voglino that she had pain radiating in her upper back. Her chief complaints at this time were pain in the "upper back and occasionally lower back." She also complained of neck pain. The Claimant told Dr. Voglino that her pain was caused by standing and carrying a tray. Like Dr. Garcia, Dr. Voglino recorded no history of a slip or traumatic incident in the Claimant's medical records. That is because the Claimant never provided either of these physicians with such a history.

Dr. Voglino diagnosed the Claimant with a protruding disc at L5/S1. He ordered her to continue light duties at work if allowed; undergo physical therapy; and continue with her pain medication. He also ordered her to return to him for a follow up visit. The Claimant thereafter underwent physical therapy and acknowledged herein that it helped relieve her pain. She returned to Dr. Voglino on July 26, 2013 who noted a 90% percent improvement in her condition with her medication and physical therapy. Dr. Voglino declared the Claimant fit for duty and ordered her to wean herself off of her medication after a week or so. He also directed the Claimant to follow up with him within 4 to 6 weeks.

The Claimant did not report another back complaint until March 4, 2014, or over 1 year later. According to the ship physician's medical records at that time, the Claimant complained of "a recurrence of low back pain with pain referred down to her left buttock and left leg." At that time, the ship's physician declared her unfit for duty as a Restaurant Stewardess. This ship physician also recommended that she be sent home to her native Nicaragua to recover from her

sciatica and have a follow up orthopedic evaluation. Finally, the ship's physician recommended that the Claimant transfer to a more suitable job in view of her medical condition.

At that time, the ship's physician noted the Claimant's unhappiness with his recommendation for her return to Nicaragua. The ship's physician then referred the Claimant to the ship's Human Resource department to further discuss his recommendation. The ship's Staff Captain, however, intervened into this situation and requested the ship's physician to refer the Claimant to a shore-side specialist for an orthopedic re-evaluation before sending her home.

On March 11, 2014, the Claimant was sent to a shore-side orthopedic surgeon (i.e. Dr. Robert Sedaros) in Merritt Island, FL for a second opinion about whether she needed to return home to Nicaragua for treatment. In response to Dr. Sedaros' medical questionnaire as to the reason for her visit, the Claimant wrote that she needed to see an orthopedic specialist because "the ship's physician think [sic] that I am not fit for duty because of [a] backache." Notably, Dr. Sedaros' medical records similarly do not reflect that Claimant had sustained a back injury as a result of a slipping accident. The Claimant did, however, inform Dr. Sedaros that she had bloody stools, asthma, weight gain, chills, redness of the eyes and a seafood allergy. If the Claimant had slipped and injured her back as alleged, it is more likely than not, that she would have reported the same to this orthopedic surgeon at this time and this physician would have recorded the same.

According to Dr. Sedaros' medical history taken from the Claimant, the Claimant told him that she had complained to the ship's physician on March 4, 2014 pain across her shoulder blades and around her neck. She further stated that she had just worked a 13-hour shift and requested some pain medication to assist her with a second upcoming shift. The ship's physician

noted that she had a "Work [sic] Comp injury in July to her low back and stated that she was not fit for duty." Dr. Sedaros' medical history further reflects that the Claimant denied any complaints of low back pain, but she had previously been evaluated by an orthopedic specialist in Miami for low back pain and was cleared for duty. Dr. Sedaros further noted that the Claimant was upset and wanted to keep working. She stated to him that she was not symptomatic whatsoever then, and that both her neck and lower back felt fine.[2]

Dr. Sedaros conducted a physical examination of the Claimant. His examination of her lower back revealed no significant tenderness and a negative straight leg raise. He noted that she had a good range of hip motion. She also had a full range of motion of the neck with no tenderness or guarding of the neck. Finally, he recorded that she had a good shoulder range of motion. Based upon his examination, Dr. Sedaros declared her fit for duty to resume work.

On June 30, 2014, however, the Claimant was once again seen at the ship's infirmary for lower back pain. This shipboard physician advised the Claimant to change her position to guest services due to her medical history. The Claimant did begin cross-training to switch to guest services on September 6, 2014.

Despite her cross-training for a position in guest services, there is no record evidence that the Claimant ever switched her position onboard the ship. In fact, the Claimant returned to the ship's infirmary on June 27, 2015 and September 1, 2015 complaining of recurring back pain. On each of these occasions, she was given ibuprofen and sent back to full duty work.

On March 2, 2016, the Claimant once again reported to the infirmary complaining of low back pain and sciatica. She was again treated with pain killers and returned to full duty. Shortly

---

[2] Either this was true at the time, or the Claimant was hesitant to reveal any existing pain out of concern that she would be declared unfit for duty and sent home to Nicaragua.

thereafter, however, the Claimant was terminated by NCL for reasons unrelated to the issues presented in this arbitration proceeding.

After her termination, the Claimant retained her first attorney, Luis Perez, Esq. Mr. Perez contacted NCL and demanded that the Claimant be sent to a doctor for persistent back pain. Mr. Perez referred the Claimant to Dr. Rolando Garcia, an orthopedic surgeon who was an in-network physician on NCL's insurance plan. On May 26, 2016, NCL arranged and paid for the Claimant to be seen by Dr. Garcia at the Orthopedic Care Center in Miami. During her initial visit with Dr. Garcia, the Claimant reported, for the first time, that her back pain was the result of a work related injury or accident onboard the ship on July 3, 2013. According to the medical history taken by Dr. Garcia, the Claimant stated that on that date, she slipped and fell backwards while carrying approximately 13-14 plates of food on her tray while walking in the galley.

Although the Claimant testified that Dr. Garcia recommended immediate surgery on her back, Dr. Garcia's medical records do not support or reflect such testimony. To the contrary, Dr. Garcia's medical records reflect that his proposed treatment plan for the Claimant was conservative in nature---physical therapy and anti-inflammatory medications for pain. He also ordered an updated MRI on her back and for her to return when the result of the MRI was available.[3]

The Claimant underwent another MRI which revealed a small central disc protrusion at L5-S1 with no change since Claimant's first MRI in July 2013. NCL then arranged for the Claimant to attend the prescribed physical therapy sessions at South Miami Hospital. The Claimant attended these sessions from June 14, 2016 to July 13, 2016. The Claimant's physical therapy notes reflect

---

[3] It is not credible to believe that Dr. Garcia would have immediately recommended surgery on the Claimant's back prior to reviewing and comparing the results of the updated MRI.

that her physical therapy sessions alleviated her reported pain. In fact, the notes reflect the following sentiments expressed by the Claimant: "feeling better. I have no pain, no burning pain. Going to see the doctor today." The notes also reflect that the Claimant stated that her pain was 0 out of 10.

The Claimant discharged her first attorney Luis Perez, Esq. and retained her current counsel, John Billera, Esq. on or about June 2016. Shortly thereafter, the Claimant abandoned the physical therapy treatments prescribed by Dr. Garcia. For some inexplicable reason, the Claimant also immediately left the care of Dr. Garcia and began seeing orthopedic surgeon Dr. Thomas Roush.[4] The Claimant began seeing Dr. Roush approximately 2 weeks after discontinuing her physical therapy sessions.

According to Dr. Roush's medical records, the Claimant informed him that she "slipped on water while towing a tray and had a twisting injury to lumbar region." [5] She complained of having persistent low back pain for the past 3 years and pain radiating down her left leg with numbness. It is found that none of these complaints were supported by any of Claimant's previous medical records. Finally, the Claimant told Dr. Roush that her pain was 8 out of 10 on this initial visit.

At the final hearing, Dr. Roush testified that the Claimant's July 8, 2013 MRI showed a herniated disc at L5-S1, with inflammation of the front covering of the nerve and that her 2016 MRI looked essentially the same. He testified that Claimant's nerves were not compressed due

---

[4] Dr. Roush is an out of network physician for NCL's insurer. He acknowledged at the final hearing that he has been involved in "somewhere plus or minus 10 or 12" of cases involving Mr. Billera's clients.

[5] At this point, the Claimant's account of the origin of her back pain had indeed changed several times. It went from an onset of pain over a course of three days at work(reported to the onboard ship physicians), to a "slip and fall"(reported after retaining her first attorney), to now a "twisting injury" as a result of a slip without a fall on water (after she alleged in her Statement of Claim that she slipped and fell).

10

to the herniated disc. During this initial visit, Dr. Roush recommended surgery (i.e. a bilateral L5 to S1 microdiscectomy) to the Claimant.

On September 30, 2016, Dr, Roush performed a bilateral laminotomy with microdiscectomy at L5-S1 on the Claimant. He removed approximately four to five percent of Claimant's disc. Dr. Roush's medical bills total $35,893. The Deerfield Beach Outpatient Surgical Center's bills, a facility regularly utilized by Dr. Roush, total $44,500\. Thus, the Claimant's outstanding medical bills total $87,473.28. Dr. Roush also testified that the Claimant will need a fusion surgery in approximately 20-30 years as a result of the continued loss of cartilage following the microdiscectomy. Dr. Roush opines that the costs of this fusion surgery will be $100,000 to $125,000. With the exception of the outstanding $87,473.28 medical bills and the projected $100,000 to $125,000 for fusion surgery, NCL has paid all of the Claimant's remaining medical bills as part of its maintenance and cure obligations.

As part of this arbitration proceeding, NCL retained Dr. Amar Rajadhyaksha ("Dr. Raj"), a board-certified orthopedic spine surgeon to perform a compulsory medical examination ("CME") on the Claimant after her surgery with Dr. Roush. It is noted that Dr. Raj has been retained in other cases by NCL's counsel to perform other such CME's. On June 12, 2017, Dr. Raj examined the Claimant. During her CME with Dr. Raj, the Claimant complained of persistent back pain and left lower extremity pain, which were her symptoms prior to surgery with Dr. Roush.

Dr. Raj's physical examination of the Claimant revealed no abnormalities. She was able to walk on her heels and toes without difficulty; she was able to stand up straight; and she did not limp. She had no spasms in the lumbar spine, and her strength and range of motion were all

normal. The Claimant presented with decreased sensation on the right distribution from L5, which, according to Dr. Raj, was inconsistent with her prior complaints of left lower extremity pain. The Claimant's reflexes were symmetric. She performed normally on the straight leg test for both legs.

Dr. Raj credibly testified that the Claimant's 2013 MRI revealed a degenerative condition at L5-S1. There were no tears in the Claimant's disc at that level. There were no fragments present on Claimant's MRI. She had some bulging at the disc, but there was no narrowing of the spinal canal. The Claimant's disc was not pushing toward her nerves. The Claimant's MRI revealed typical disc degeneration for someone in their 30s to 50s, and L5-S1 is one of the most common levels for degeneration to occur.

Dr. Raj testified that the Claimant's 2016 MRI looked the same. There was mild dehydration of the disc, but no change from 2013. Claimant still had a disc bulge, but no narrowing of the spinal canal or nerve compression. While the Claimant's MRIs show early signs of degeneration, they show no nerve compression, nerve irritation, or narrowing of the spinal canal. Dr. Roush's assertion that the Claimant's nerves were red and irritated is found not to be supported by the MRI findings. Dr. Roush documented a full-thickness annual tear on his operative report, but such a tear is not found on the Claimant's MRIs, although Dr. Raj credibly testified that such a tear would expected to be seen on the images.

Dr. Roush's decision to immediately recommend surgery was influenced, in large part, by the Claimant's assertion of a June 3, 2013 "slipping and twisting" injury and her subjective symptoms presented to him during her initial visit. It is found that the Claimant's subjective symptoms were less than credible at that time and more likely than not influenced by this

12

anticipated litigation. In May 2016 and prior to seeing Dr. Roush, the Claimant had a normal neurological examination, negative straight leg raise, no weakness, no documented sensory loss. Moreover, the Claimant was improving with her physical therapy. Two weeks later with Dr. Roush, she presented with weakness, loss of sensation, and a limp. It is noted that none of the three prior orthopedic surgeons that examined the Claimant prior to Dr. Roush, found any lower extremity weakness. The fact that the Claimant presented with weakness, loss of sensation and a limp to Dr. Roush two weeks after successful physical therapy strains credulity.

In weighing the evidence in its totality, it is found that the Claimant's back surgery was not medically indicated or necessary. Credible evidence adduced at the final hearing established that the Claimant would have continued to benefit from conservative treatment, such as physical therapy, injections and/or medications, since her MRI showed no nerve root compression. Indeed, it is significantly noted that the surgery did not seemingly improve or resolve the Claimant's stated symptoms.

Finally, it is found that credible medical testimony established that the Claimant has now reached maximum medical cure ("MMC") for her back pain. That is, there is no credible medical evidence in the record that the Claimant's back condition will improve with additional medical treatment. Any further treatment will only be palliative in nature.

## CONCLUSIONS OF LAW

### JONES ACT NEGLIGENCE CLAIM

The Claimant has filed a Jones Act negligence claim against Respondent NCL based upon her allegations that she had an accident aboard ship on June 3, 2013. On that date, she claims to have slipped on salad dressing on the galley floor while carrying a tray of heavy dishes. She

further claims that the salad dressing, approximately one to one and one-half feet in diameter, had been left on the floor for a sufficient amount of time for someone to have seen it; cleaned it; and/or roped off the area until it could be cleaned.

The Jones Act confers a cause of action on "[a]ny seaman" who suffers a "personal injury in the course of his employment." 46 U.S.C. Section 30104.  A claim under the Jones Act requires a finding of a negligent breach of duty and causation.  See *Rutherford v. Lake Michigan Contractors, Inc.*, 132 F. Supp. 2d 592 (W. D. Mich. 2000).  To prove the defendant's negligence under the Jones Act, the plaintiff must prove by a preponderance of the evidence that the defendant knew of, or in the exercise of due care should have known of, the alleged dangerous condition which caused the plaintiff's injury.  See *Colburn v. Bunge Towing, Inc.*, 883 F. 2d 372, 374 (5th Cir. 1989).  The plaintiff has the burden of demonstrating, by a preponderance of the evidence, that the defendant was negligent, and that such negligence was the cause of his injury.  *Dise v. Express Marine, Inc.*, 476 F. App'x 514, 519(4th Cir. 2011); *Crow v. Cooper Marine & Timberlands Corp.*, 657 F. Supp. 2d 1248, 1256 (S. D. Ala. 2009).

In weighing and assessing the credibility of the evidence adduced at the final hearing, it is concluded that the Claimant has not met her burden of proof for Jones Act negligence.  That is, there was no credible evidence of the existence of a foreign substance on NCL's galley floor which caused the Claimant to slip and injure her back.  First, it is not plausible to believe that a salad dressing puddle, one and one-half feet in diameter, would go undetected for a significant period in a well-travelled galley walkway area for crewmen.  Next, the Claimant's lengthy medical records credibly establish that she had a gradual onset of back pain likely caused by a degenerative disc condition and exacerbated by her duties as an Assistant Waitress.  Finally, it was only after the Claimant retained her initial legal counsel that she began to report to her

treating physicians that her back pain was the result of a slipping accident onboard ship. And even at that point, her accounts of the alleged slipping accident vacillated between her visits with Dr. Rolando Garcia and Dr. Thomas Roush.

Prior to her contemplation and/or institution of litigation, it is concluded that the Claimant credibly reported to her treating physicians that her back pain had set in over the course of a few days and were not the result of any traumatic event. In fact, at that time, she credibly reported to her physicians that her pain was in her upper back, neck, and generally all over her back. This type of reported pain is certainly consistent with her duties of carrying large trays of food and/or empty dishes for extended periods at a time daily. Thus, since the evidence failed to credibly establish the existence of salad dressing or other foreign substance left on the floor as alleged by the Claimant, her Jones Act negligence claim for damages necessarily fails.

## UNSEAWORTHINESS CLAIM

The Claimant has also alleged herein that NCL breached its duty to provide her with a seaworthy vessel which was reasonably fit for its intended purpose. Specifically, the Claimant has asserted that the presence of the alleged salad dressing on the galley walkway was a transitory condition that rendered the galley walkway unreasonably slippery and thereby, unfit for its intended purpose. See, e.g. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960) (transitory conditions which exist even for a few moments may constitute unseaworthiness); *Dos Santos v. Ajax Nav. Corp.*, 531 So. 2d 231 (Fla. 3rd DCA 1988) (unseaworthiness claim should go to jury where crewmember slipped on butter that had fallen on galley floor).

The Claimant has the burden of proving by the preponderance of the evidence that the vessel was unseaworthy. *Delaney v. U.S. Seafoods, LLC*, 2011 WL 6210627 (W.D. Wash. 2011).

15

Based upon the conclusion that the Claimant has failed to prove the existence of salad dressing or any other foreign or transitory condition on the floor which caused her any injury, her unseaworthiness claim for damages against NCL fails for the same reasons as her Jones Act negligence claim.

## MAINTENANCE AND CURE CLAIM

In this case, the Claimant has next asserted a maintenance and cure claim against NCL in this proceeding. Maintenance is a per diem living allowance intended to provide a seaman with food and lodging akin to that he would receive aboard ship, payable as long as the seaman is outside the hospital and has not reached the point of MMC. *Calmar S.S. Corp v. Taylor,* 303 U.S. 525, 653 (1938). Cure involves the payment of therapeutic medical and hospital expenses not otherwise furnished to the seaman to MMC. *Id.* A crewmember is entitled to payment for medical expenses in the amount necessary to bring her to maximum cure. *Flores v. Carnival Cruise Lines,* 47 F.3d 1120, 1127 (11th Cir. 1995). Cure is a seaman's right to necessary and appropriate medical services. *Edmond v. Offshore Specialty Fabricators, Inc.,* 2009 WL 1459701, *2 (E.D. La. May 26, 2009). Medical expenses relating to the seaman's cure must be reasonable. *Caulfield v. AC & D Marine, Inc.,* 633 F.2d 1129 (5th Cir. 1981). The "purpose of cure is purely compensatory and restricts a seaman's recovery to only out-of-pocket 'cure' expenses." *Moran Towing & Transp. Co. v. Lombas,* 58 F.3d 24, 26 (2d Cir. 1995) (quoting *Al-Zawkari v. Am. S.S. Co.,* 871 F.2d 585, 588 (6th Cir. 1989).

The maintenance and cure obligation is not designed to be a pension for life. *Farrell v. United States,* 336 U.S. 511, 514-15 (1949). According to general maritime law, an employer's obligation to provide maintenance and cure terminates when the subject seaman reaches MMC.

16

*Farrell v. United States,* 336 U.S. 511, 515 (1949). Whether a particular seaman has reached MMC is strictly a medical question to be determined by the medical professionals. *See generally Breese v. A WI, Inc.,* 823 F.2d 100 (5th Cir. 1987). The employer is entitled to rely on the professional opinion of a physician as to a seaman's status of MMC. *See Harrell v. Dixon Bay Transp. Co.,* 718 F.2d 123, 129-30 (5th Cir. 1983).

It is said that MMC is reached when a seaman's condition will not further improve with additional medical treatment. *Vella v. Ford Motor Co.,* 421 U.S. 1, 5 (1975); *Morales v. Garijak, Inc.,* 829 F.2d 1355 (5th Cir. 1987); *Cox v. Dravo Corp.,* 517 F.2d 620 (3d Cir. 1975), *cert. denied,* 423 U.S. 1020 (1975); *Crooks v. United States,* 459 F.2d 631 (9th Cir. 1972). Treatment that is palliative or designed merely to maintain the stable condition is not compensable under the maintenance and cure doctrine. *Muruaga v. United States,* 172 F. 2d 318, 321 (2d Cir. 1949).

In the instant case, the Claimant's maintenance and cure claim relates solely to NCL's refusal to pay for the medical costs associated with her back surgery performed by Dr. Roush.[6] Based upon the earlier determination herein that Dr. Roush's surgery was not medically indicated, necessary or curative, it is concluded that the Claimant's maintenance and cure claim in this regard necessarily fails. That is, as this surgery was merely elective or palliative in nature, it is not deemed compensable as maintenance and cure.

DISABILITY BENEFITS UNDER THE COLLECTIVE BARGAINING AGREEMENT

The Claimant also seeks disability benefits in the sum of $100,000 under the CBA between NCL and the seafarer's union. This claim is based upon her contention that she sustained a

---

[6] NCL has promptly and fully paid for all of the Claimant's remaining maintenance and cure claims made herein.

17

disabling permanent injury as a result of the slipping accident during the course and scope of her employment for NCL. Article 21 of NCL's Collective Bargaining Agreement provides, in relevant part, as follows:

> A Seafarer who suffers a **disabling permanent injury because of an accident from any cause whatsoever** whilst in the employment of Norwegian, regardless of fault…shall in addition to his Sick Pay, be entitled to compensation per the provisions of this Agreement.
>
> \*\*\*
>
> Regardless of the degree of disability, an **injury** as described in the first paragraph of this Article which results in loss of profession will entitle the Seafarer to the full amount of compensation, USD on-hundred-thousand (100,000) for Ratings (Group B, C2, C4, & D) and USO one-hundred-and-forty-thousand (140,000) for Officers (Groups A, C1, & C3). For purposes of this Article, loss of profession means when the physical condition of the Seafarer prevents a return to sea service, under applicable national and international standards or when it is otherwise clear that the Seafarer's condition will adversely prevent the Seafarer's future of comparable employment on board ships. (Emphasis added).

Under the plain and unambiguous language of the CBA, the Claimant is only entitled to disability benefits for as disabling permanent injury because of an accident. Based upon the earlier findings and conclusions herein that the Claimant's back pain was the result of the gradual onset of a degenerative disc condition rather than any slipping or other traumatic accident, she is ineligible to receive any disability benefits under the CBA. Even assuming *arguendo* that the Claimant had sustained an injury as a result of an accident, there is credible medical evidence in the record to support the additional conclusion that the Claimant has not sustained a disabling permanent injury. Accordingly, this claim is denied.

## ATTORNEY'S FEES

Finally, the Claimant seeks to recoup her reasonable attorney's fees for having to institute this arbitration proceeding to recover her unpaid maintenance and cure claim (i.e. Dr. Roush's surgical costs) from NCL. *See Vaughan v. Atkinson,* 369 U.S. 527 (1962) (recognizing the recoupment of reasonable attorney's fees where ship owner's breach of its obligation to provide

maintenance and cure is willful and wanton). Based upon the finding and conclusion, however, that NCL was not obligated to pay for the Claimant's surgical costs with Dr. Roush, her requests for attorney's fees must necessarily be denied as well.

## AWARD

Based upon the foregoing factual findings and conclusions, I award as follows:

1. The Claimant Shera Marie Hodgson Williams' claims against Respondent Norwegian Cruise Lines (Bahamas) LTD. for Jones Act negligence; unseaworthiness; unpaid maintenance and cure benefits; disability benefits under the CBA; and reasonable attorney's fees are all **denied.**

2. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$7600.00, shall be borne solely by Norwegian Cruise Lines (Bahamas) LTD, and the compensation and expenses of the arbitrator totaling US$22,794.23 shall be borne by Norwegian Cruise Lines (Bahamas) LTD.

3. This award is in full settlement of all claims submitted to this Arbitration.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in Miami, Florida, United States of America.

04.10.18
Date

Melvia B. Green, Esq.
Arbitrator

State of Florida           )
                           ) SS:
County of Hillsborough     )

On this  10  day of  April  , 2018, before me personally came and appeared  Melvia B. Green  , to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed the same.

_____
Notary Public

[Notary seal: MICHAEL RONSIEK, STATE OF FLORIDA NOTARY PUBLIC, My Comm. Expires February 08, 2022, No. GG 17468]