**Page 1**

```
 1          AMERICAN ARBITRATION ASSOCIATION
       INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
 2

 3          CASE NO.:  01-16-0002-6900

 4
    SHERMA MARIE WILLIAMS HODGSON,
 5
        Claimant,
 6
    vs.
 7
    NORWEGIAN CRUISE LINES,
 8
        Respondent.
 9
    _____/
10

11
              JEANNIE REPORTING SERVICES
12             28 W. Flagler Street
               Suite 610
13             Miami, Florida 33130
               Thursday, 11:00 a.m.
14             October 12, 2017

15

16    VIDEO RECORDED DEPOSITION OF RESPONDENT NCL
17             MARLEN PALMERO
18
19      Taken before Jeanette Sanchez, Florida
20  Professional Reporter, Notary Public in and for the
21  State of Florida at Large, pursuant to Notice of
22  Taking Deposition filed in the above case.
23
24
25
```

**Page 2**

```
 1  APPEARANCES:
 2  ON BEHALF OF THE CLAIMANT:
    BILLERA LAW
 3  2201 N.W. Corporate Boulevard
    Suite 103,
 4  Boca Raton, Florida 33431
    BY:  John Billera, Esquire
 5
    ON BEHALF OF THE RESPONDENT:
 6  MASE, TINELLI, MEBANE & BRIGGS
    SBS Tower
 7  2601 S. Bayshore Drive
    Suite 800
 8  Miami, Florida 33133
    BY:  Christine Dimitriou, Esquire
 9
10  ALSO PRESENT:  Tom Charron, Custom Video Services

11
    I N D E X
12
           E X A M I N A T I O N
13
    MARLEN PALMERO
14          DIRECT  CROSS  REDIRECT RECROSS
     MR. BILLERA       3
15
16  EXHIBITS FOR IDENTIFICATION

17  CLAIMANT'S                             PAGE

18  A       Second Notice of Taking        12
            Respondent's Video Deposition
19          Duces Tecum
    B       Claims File                    111
20  C       Job description &              111
            Dr. Salmeron's report
21
22
23
24
25
```

**Page 3**

```
 1          THE VIDEOGRAPHER:  Today is
 2      October 12th, 2017.  The time is
 3      approximately 11:00 a.m.  We are at 28 West
 4      Flagler Street to videotape the deposition
 5      of the corporate rep for Norwegian Cruise
 6      Lines, Marlen Palmero, in the case styled
 7      Shera Marie Williams Hodgson vs. Norwegian
 8      Cruise Lines, Case No. 01-16-0002.
 9          The court reporter is Jeannie Sanchez.
10      My name is Tom Charron with Custom Video.
11          Counsel now please state their
12      appearance for the record.
13          MR. BILLERA:  Good morning.  This is
14      John Billera.  I represent Shera Hodgson.
15          MS. DIMITRIOU:  Good morning.
16      Christine Dimitriou representing Norwegian
17      Cruise Lines.
18  Thereupon:
19          MARLEN PALMERO,
20  was called as a witness and, having been first duly
21  sworn, was examined and testified as follows:
22              DIRECT EXAMINATION
23  BY MR. BILLERA:
24      Q.    Please give us your full legal name.
25      A.    Marlen Palmero.
```

**Page 4**

```
 1      Q.    And what is your business address?
 2      A.    7665 Corporate Center Drive, Miami,
 3  Florida 33126.
 4      Q.    And what do you do for a living?
 5      A.    I am a senior claims representative
 6  for Norwegian Cruise Lines.
 7      Q.    How long have you been a senior claims
 8  representative for Norwegian Cruise Lines?
 9      A.    Since May of 2006.
10      Q.    What did you do before that?
11      A.    I am sorry.
12          THE VIDEOGRAPHER:  One moment, please.
13          (Thereupon, a discussion was held
14      off the record.)
15          (Thereupon, the question was read back.)
16          THE WITNESS:  Oh, I'm sorry.  What did
17      I do before?  I was a legal secretary at
18      Norwegian Cruise Lines.
19  BY MR. BILLERA:
20      Q.    How long were you a legal secretary at
21  Norwegian Cruise Lines?
22      A.    I began in October of 2002.
23      Q.    And were you a legal secretary in the
24  claims department?
25      A.    Yes.
```

105

1    Q.    If you look at 423, it says,
2    "Follow-Up Appointment:  Four to six weeks."
3          If you look at 425, "Patient Reminder
4    to Follow Up.  Care of legal guardian/parent Isha
5    Amaro."  Isha Amaro is from NCL?
6    A.    No, I believe she is from South Miami.
7    Q.    7665 Corporate Center Drive?
8    A.    Oh, that is us.  I don't know who that
9    is.
10   Q.    Phone number (786) 662-4850?
11   A.    That is the phone number for South
12   Miami International Clinic.
13         The follow-up appointment says "four
14   to six weeks ortho or ship doctor."
15   Q.    "Or," it says, "ship," and then what
16   above it?
17   A.    I think it says, "sooner per needed."
18   Q.    Sooner.
19         Did she follow up with the ship's
20   doctor in four to six weeks?
21   A.    I am not sure.  I'd have to go back to
22   the ship's records.
23   Q.    Let's go back.  Dr. Voglino wanted to
24   see her again in a month and did not.
25   A.    I saw she was seen a month later, but

106

1    it was for anxiety.
2    Q.    All right.  She is supposed to have a
3    follow-up examination of her back; is that not
4    correct?  Is that not your understanding of what
5    Dr. Voglino wanted to happen?
6          In fact, that's what he writes:  I am
7    concerned for your orthopedic care.
8          "I am writing this letter to try to
9    ensure you are getting the appropriate orthopedic
10   care.  I have been concerned about your orthopedic
11   condition."
12   A.    No, I am reading.  This seems to be a
13   standard letter.
14   Q.    Did anyone take this letter and say
15   she needs a -- she needs an orthopedic evaluation
16   either onboard the ship or with Dr. Voglino?
17   A.    I don't see that one was set up.
18   Q.    Or done on the ship, correct?
19   A.    No.  But she was seen on the ship, and
20   she didn't mention...
21   Q.    So she should have done -- she should
22   have pressed her own orthopedic evaluation?
23   A.    No.  I mean, but she -- he wanted to
24   ensure she was getting the appropriate orthopedic
25   care.

107

1    Q.    Correct.
2    A.    I feel that, if she needed care, she
3    would have mentioned something.  He put her fit for
4    duty.
5    Q.    In fact, if you look at August 22,
6    2013, when she goes in for inability to sleep and
7    right arm pain, the one thing that is not examined
8    is her back.  Do you see that?
9    A.    I see that there is no mention of her
10   back.
11   Q.    No.  There is no little circles drawn
12   on the area EXT, and we know in other records, when
13   she complained of back pain, it is noted in EXT?
14         MS. DIMITRIOU:  John, I just want to
15         put on the record we have reached the three
16         hours.
17         MR. BILLERA:  Have we?
18         MS. DIMITRIOU:  Yes.
19         MR. BILLERA:  Do you have it?
20         (Thereupon, a discussion was held
21         off the record.)
22   BY MR. BILLERA:
23   Q.    Has NCL paid Dr. Roush for the
24   surgeries he performed on Ms. Hodgson?
25   A.    I believe we have approved the payment

108

1    for our network rates for Dr. Roush.
2    Q.    Did NCL tender surgery with Dr. Garcia?
3    A.    We did not arrange the surgery, no.
4    Q.    Has Dr. Roush been paid?
5    A.    I don't know if he has been paid
6    already.  I'd have to check, but I know it has been
7    approved.
8    Q.    How much are the network rates?
9    A.    I have to check with United
10   Healthcare.  They are the ones that process our
11   invoices -- our claims.
12   Q.    Therefore, NCL feels like her back
13   condition for which she had surgery arose on the
14   ship, during the course of her employment, correct?
15   A.    I am sorry.  Can you repeat the
16   question?
17   Q.    Therefore, NCL acknowledges that the
18   back surgery that she had with Dr. Roush is related
19   to a condition that arose on the vessel during the
20   course of her work, correct?
21   A.    I believe the initial condition arose
22   on the ship; however, when she signed off, there
23   was nothing stating that she was not fit for duty,
24   that she needed any additional medical care for her
25   back.

**109**

1   Q.   Other than she treated for back pain a
2   couple of days before she signed off, correct?
3   A.   Well, back pain can just be not
4   curative in nature.
5   Q.   And she was never MMC'd by any doctor
6   at any time for her back.  Do you agree with that?
7   A.   She was declared fit for duty without
8   restrictions.
9   Q.   No.  She was told she can return to
10  work.  That is all it said.
11  A.   Correct.
12  Q.   She never was declared fit for duty
13  with no restrictions by any doctor?
14  A.   Well, there is no restrictions.
15  Q.   But she was never declared fit for
16  duty with no restrictions by any doctor, was she?
17  A.   "Return to work" can mean fit for
18  duty.
19  Q.   Okay.  But you said she was declared
20  by a doctor fit for duty without restrictions.
21  That is not true, isn't it?
22  A.   It states that she can return to work.
23  It does not show any restrictions.
24  Q.   And that's all it says, "Return to
25  work"?

**110**

1   A.   Correct.
2   Q.   Do you understand that she has now
3   developed, according to Dr. Vargas -- NCL tendered
4   Dr. Vargas in Nicaragua -- I will just be a second.
5   NCL provided Dr. Vargas for an
6   evaluation in Nicaragua, correct?
7   A.   I believe it is Dr. Vega, but let me
8   make sure.
9   Q.   Oh, you are right.  Eduardo Vega?
10  A.   Dr. Vega?
11  Q.   Yes.
12  A.   Yes.
13  Q.   And Dr. Vega found that she is
14  suffering from fibrosis around her nerve root after
15  the surgery.  Are you aware of that?
16  A.   I don't remember seeing that record.
17  Q.   And that, therefore, she is continuing
18  to have severe pain in one of her legs, secondary
19  to the fibrosis?
20  A.   She is still under maintenance and
21  cure at this time.
22  Q.   Of course.  The problem with fibrosis,
23  though, is that you can't do more surgery to fix it
24  because it causes more fibrosis, if you know how a
25  failed back works.

**111**

1   Are you aware of that?
2   MS. DIMITRIOU:  Objection to form.
3   THE WITNESS:  I am not a doctor.
4   MR. BILLERA:  That is all I have.
5   Thank you so much.
6   MS. DIMITRIOU:  I have no questions.
7   (Thereupon, a discussion was held off
8   the record.)
9   MR. BILLERA:  I would like to attach
10  this in globo as Composite Exhibit B since
11  we referred to it throughout.
12  (Thereupon, Claimant's Exhibit B
13  and Claimant's Exhibit C were marked
14  for identification.)
15  (Thereupon, the deposition was
16  concluded at 2:22 p.m.)

**112**

1   CERTIFICATE OF SHORTHAND REPORTER
2   STATE OF FLORIDA    )
3          )  SS.
   COUNTY OF MIAMI-DADE)
4
5   I, Jeanette Sanchez, Florida
   Professional Reporter, do hereby certify that I was
   authorized to and did stenographically report
6   deposition of MARLEN PALMERO, that a review of the
   transcript**was not** requested; and that the
7   foregoing transcript, pages 1 through 111 is a true
   record of my stenographic notes.
8
9   I FURTHER CERTIFY that I am not a
   relative, employee, or attorney, or counsel of any
   of the parties, nor am I a relative or employee of
10  any of the parties' attorney or counsel connected
   with the action, nor am I financially interested in
11  the action.
12  DATED, this 30th day of October 2017.
13
14
15  _____
   JEANETTE SANCHEZ
   Florida Professional Reporter
16
17
18
19
20
21
22
23
24
25